```
               UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF MISSOURI
                     NORTHERN DIVISION


TYRENE L. HARRIS,                  )
                                   )
           Plaintiff,              )
                                   )
     v.                            )      No. 2:10 CV 54 DDN
                                   )
                                   )
MICHAEL J. ASTRUE,                 )
Commissioner of Social Security,   )
                                   )
           Defendant.              )
```

## MEMORANDUM

This action is before the court for judicial review of the final decision of defendant Commissioner of Social Security denying the application of plaintiff Tyrene L. Harris for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. 401, et seq., and supplemental security income under Title XVI of the Act, 42 U.S.C. § 1381, et seq. The parties have consented to the exercise of plenary authority by the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). (Doc. 8.)

For the reasons set forth below, the ALJ's decision is remanded for reconsideration and further proceedings consistent with this opinion.

## I. BACKGROUND

Plaintiff Tyrene L. Harris was born on September 5, 1976. (Tr. 46.) She is 5 feet 6 inches tall with a weight that has ranged from 130 to 167 pounds. (Tr. 229, 246.) She completed the 12th grade and currently lives with her mother. (Tr. 23.) She last worked about "two to three years ago" as an account executive selling cars. (Tr. 24.)

In June 2007, plaintiff applied for disability insurance benefits and supplemental security income, alleging that she became disabled on April 1, 2004 on account of a Schizoaffective Disorder,[1] Bipolar Type.[2] (Tr. 11, 24-25, 90, 96, 143.) She received a notice of disapproved claims on August 21, 2007. (Tr. 11, 49.) A hearing before an ALJ was held on April 16, 2009. At the hearing plaintiff amended her disability onset date to April 7, 2007. The ALJ issued a decision that denied benefits on July 22, 2009. (Tr. 8-19.) On June 24, 2010, the Appeals Council declined her request for review of the ALJ's decision. (Tr. 1.) Thus, the decision of the ALJ stands as the final decision of the Commissioner.

## II.  MEDICAL HISTORY

The administrative record indicates that on April 10, 2005, plaintiff was admitted to Canyon Ridge Hospital immediately following an episode of yelling, screaming and acting in a delusional manner. The discharge summary report stated that she left her home and knocked on neighbors' front doors. Plaintiff was considered to be gravely disabled and a danger to herself. Accordingly, she was placed on an involuntary hold and was brought to Canyon Ridge hospital for stabilization. Upon admission, plaintiff was a poor historian and appeared confused. She needed to be redirected several times and was unable to provide adequate information regarding the events leading to her hospitalization. Plaintiff was diagnosed with "Psychosis Not Otherwise Specified" and assigned a Global Assessment of Functioning (GAF) score of 30.[3] Plaintiff

---

[1] Schizoaffective Disorder is an admixture of symptoms suggestive of both schizophrenia and affective disorder. Stedman's Medical Dictionary, 1389 (28th ed. 2006). Schizophrenia is a common type of psychosis, characterized by a disorder in the thinking processes, such as delusions and hallucinations, and extensive withdrawal of the individual's interest from other people and the outside world, and the investment of it in his own. Id. at 1390. Affective pertains to emotion, feeling, sensibility, or a mental state. Id. at 32.

[2] Bipolar disorder is an affective disorder characterized by the occurrence of alternating manic, hypomanic, or mixed episodes and with major depressive episodes. Stedman's at 568.

[3] A GAF score, short for Global Assessment of Functioning, helps summarize a patient's overall ability to function. A GAF score has two components. The first component covers symptom severity and the second component
(continued...)

was stabilized during her hospitalization and discharged on April 18, 2005 with a GAF score of 40.[4] (Tr. 226.)

On April 7, 2007, plaintiff was involuntarily admitted to Mid-Missouri Mental Health Center by her mother after exhibiting bizarre behavior. Upon admission, plaintiff was placed under the care of Dr. Nirmala Kurian, an attending physician and staff psychiatrist. (Tr. 237.) Plaintiff was assigned a GAF score of 40. (Tr 239.) Dr. Kurian noted that plaintiff was dressed eccentrically and exhibited an increased amount of motor activity. Plaintiff had a loud and excessive push of speech. Her flow of thought was circumstantial and tangential with a flight of ideas and loose associations. Her behavior was irritable and her mood was elevated. Her affect[5] was anxious and she had delusions of grandeur. Her recent and remote memory were poor. Moreover, her insight[6] and judgment were poor, she did not know why she was at the facility, and she was unmotivated for treatment. (Tr. 237.) Laboratory tests indicated that her medications were at subtherapeutic levels. (Tr. 15, 237.) She was placed on a series of medications and subsequently, her mood and behavior improved until her symptoms of mania "eventually resolved." Plaintiff's mother reported that plaintiff's behavior had been remarkably similar to that of her father, who never accepted that

---

(...continued)
covers functioning. A patient's GAF score represents the worst of the two components.

On the GAF scale, a score from 21-30 indicates behavior that is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment . . . or inability to function in almost all areas. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, 32-34 (4th ed. 2000).

[4] A GAF of 31 through 40 means there is impairment in reality testing or communication (such as speech that is at times illogical, obscure or irrelevant), or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (such as depressed, avoids friends, neglects family, and is unable to work). A score of 31 represents worse than serious symptoms. Diagnostic and Statistical Manual of Mental Disorders at 32-34.

[5] Affect refers to the emotional feeling, tone, and mood attached to a thought, including its external manifestations. Stedman's at 32.

[6] Insight is the self-understanding as to the motives and reasons behind one's actions. Stedman's at 788-89.

he needed medication and as a result, spent most of his adult life residing in an institution for treatment of his Bipolar Disorder. (Tr. 238.) Plaintiff was discharged on May 25, 2007 with a diagnosis of Bipolar I Manic with Psychotic Features. Her GAF score was 55. (Tr. 239.)

On May 29, 2007 plaintiff was evaluated at Burrell Behavioral Health. (Tr. 244.) The evaluator noted that plaintiff would not elaborate on her psychiatric history—to the point of being secretive. Plaintiff did, however, state that her father and paternal aunt are both in institutions for mental problems, but again, would not elaborate further. (Tr. 242.) Plaintiff stated that she was "fine" and that she went to the Mid-Missouri Mental Health Center because she was "a little stressed." (Tr. 244.)

On August 20, 2007, Dr. Glen Frisch, a state agency psychiatrist, completed a psychiatric review technique form and a mental residual functional capacity assessment regarding plaintiff. (Tr. 249-63.) Dr. Frisch diagnosed her with Bipolar Disorder. (Tr. 252.) He noted that she has a medically determinable impairment and opined that her allegation of Bipolar Disorder was both consistent with the medical evidence and was credible. (Tr. 259.) However, Dr. Frisch concluded that plaintiff: (a) retains the ability to understand and remember simple instructions; (b) could carry out simple work instructions and could maintain adequate attendance and sustain an ordinary routine without special supervision; (c) could interact adequately with peers and supervisors in a work setting that has limited demands for social interactions; and (d) could adapt to minor changes in a work setting. (Tr. 263.)

On March 6, 2008 plaintiff was again admitted to the Mid-Missouri Mental Health Center. (Tr. 265.) She was placed under the care of Dr. Tina Drury, a Staff Physician Specialist. Upon admission, plaintiff had a GAF score of 35. (Tr. 274.) She was distractible, evasive, and jumped from one topic to another without connections. She appeared anxious, described her mood as "restless," and admitted that her thoughts were racing. Her sleep was "good," but she felt tired all the time. She

denied suicidal or homicidal ideation.[7]  She reported auditory hallucinations; she heard voices telling her good things, a male and female voice telling her to harm others, and babies crying.  She also experienced visual hallucinations.  She denied recent paranoia and could not remember when her last paranoid thoughts occurred.  However, she admitted that, when she lived in California, she believed that "people were out to get her."  Dr. Drury also noted that plaintiff had a history of psychogenic polydipsia[8] and currently drank between 1 to 2 gallons of water per day.  When asked why, plaintiff stated that her doctor told her that it would flush the medications out of her system.  During plaintiff's mental status examination, she appeared sad and worried, her flow of thought was tangential, and she had a flight of ideas with loose associations. Her speech was soft and slowed.  She perseverated[9] on some things.  Her mood was depressed and her affect was flat and anxious.  She had somatic[10] complaints and she was suspicious.  Her orientation to time, place, and person was impaired and she was unable to concentrate.  She had amnesia and her recent memory was poor.  Her intellect was judged below normal.  She had poor abstraction,[11] her insight was poor, and she did not know why she was at the mental health facility.  She complained of fatigue, change in appetite, and swelling in the ankles and around the eyes.  She had a history of hypertension and seizure disorder.  She scored 26 out of 30 on organic screening; she missed 1 point for attention and calculation and 3 points for recall.  (Tr. 271.)

---

[7] Ideation is the formation of ideas or thoughts.  Stedman's at 761.

[8] Psychogenic polydipsia is excessive fluid consumption resulting from a disorder of the personality, without demonstrable organic lesion. Stedman's at 1234.

[9] Perseveration is the repetition of a previously appropriate or correct response, even though the repeated response has since become inappropriate or incorrect.  Stedman's at 1172.

[10] Somatic relates to the soma or trunk, the wall of the body cavity, or the body in general; relating to the vegetative, as distinguished from the generative, functions.  Stedman's at 1434.

[11] Abstraction is exclusive mental concentration; the process of selecting a certain aspect of a concept from the whole.  Stedman's at 7.

On June 24, 2008, plaintiff was discharged from her second stay at the Mid-Missouri Health Center. (Tr. 271.) Upon discharge, she was alert, oriented, and in no acute medical distress. Her mood and affect were euthymic.[12] She denied suicidal or homicidal ideation and her thoughts were goal-directed. She denied auditory or visual hallucinations and her insight and judgment were fair. She was diagnosed with Schizoaffective Disorder—Bipolar Type and assigned a GAF score of 50.[13] (Tr. 274.)

Plaintiff continued to be seen at Burrell Behavioral Health. (Tr. 343-59.) On January 20, 2009, she reported going to the YMCA, exercising, and cleaning the house she shared with her mother. She also reported feeling sick and attributed it to the medications. Consequently, her medications were adjusted. (Tr. 344.)

On February 23, 2009, plaintiff reported exercising, "hanging out with friends," and sleeping at night. Burrell Behavioral Health noted that she was "doing well." (Tr. 345.)

On March 17, 2009, Dr. Jennifer Brockman, plaintiff's treating psychiatrist, requested a "crisis appointment" with plaintiff and her mother at the Burrell outpatient clinic. (Tr. 346, 361.) Dr. Brockman reported that plaintiff had been noncompliant with her treatment starting back in November or December and that she had slowly stopped taking all of her medications. When Dr. Brockman decreased plaintiff's Cogentin[14] dosage, as per plaintiff's request because it caused her drowsiness, plaintiff discontinued her other medications without Dr. Brockman's knowledge. At the appointment, plaintiff had a flat affect and was almost catatonic. She provided inappropriate answers to questions and

---

[12] Euthymia is joyfulness; mental peace and tranquility. Stedman's at 545.

[13] A GAF of 41 through 50 is characterized by serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). Diagnostic and Statistical Manual of Mental Disorders at 32-34.

[14] Cogentin is used to treat involuntary muscle spasms caused by taking certain psychiatric drugs. WebMD, http://www.webmd.com/drugs (last visited July 21, 2011).

had severe thought blocking; she was unable to answer and cried instead. She was an unreliable historian. She was floridly psychotic and appeared to be paranoid. Her mother stated that "out of desperation" she was able to get plaintiff to restart her medications between 3 and 4 weeks prior to this episode. However, the medications did not make a significant difference. (Tr. 361.) Accordingly, Dr. Brockman encouraged hospitalization and plaintiff agreed to go the Moberly, Missouri Emergency Room. (Tr. 346.)

On March 17, 2009, plaintiff was voluntarily admitted to the Audrain Medical Center following treatment at the Moberly, Missouri Emergency Room. (Tr. 363.) Upon admission, plaintiff had a GAF score of 10.[15] (Tr. 368.) She was initially evaluated by Dr. Jennifer Brockman. Plaintiff stated that the ER administered something to her, which Dr. Brockman suspected was benzodiazepine. Plaintiff's speech was "better" and more appropriate than it had been earlier in the day. She also appeared slightly more animated. Her eye contact was fair and her thought processing was tangential. She had thought blocking and loose association at times and she denied perceptual disturbances. However, Dr. Brockman noted that she was unsure how reliable plaintiff was in this regard. Plaintiff's recent and remote memory were fair, although actually impaired as a result of the disease process. Her insight, judgment and motivation were chronically fair to poor. Dr. Brockman noted that plaintiff had "good" verbal skills and that "overall she has a good personality and desires to be in a different station in life." (Tr. 363.) However, Dr. Brockman's assessment of plaintiff's ability to do work related-activities was that her mental impairments left her with poor or no ability to function in a variety of daily activities and social situations. (Tr. 338-39.)

On April 7, 2009, plaintiff was discharged from the Audrain Medical Center to outpatient care at Burrell Behavioral Center. Her thought process had improved and she did not have suicidal ideations or

---

[15] A GAF of 1-10 indicates a persistent danger of severely hurting self or others (e.g., recurrent violence) or persistent inability to maintain minimal personal hygiene or serious suicidal acts with clear expectation of death. Diagnostic and Statistical Manual of Mental Disorders at 32-34.

hallucinations. (Tr. 367.) Her diagnosis was Bipolar Affective Disorder, Severe and her GAF score was 60. (Tr. 367-68.)

**Testimony at the Hearing**

On April 16, 2009 a hearing was conducted before an ALJ. (Tr. 19.) Plaintiff testified to the following. She currently lives with her mother and the last time she worked was "maybe two to three years ago" as an account executive/sales person. (Tr. 23-24.) She cannot work because she gets nervous and anxious. She cannot sleep. (Tr. 25.) She confirmed that, as of January and before her hospitalization in March of 2009, she attended the YMCA, exercised, cleaned the house, socialized with friends, slept at night, stayed busy, and generally was "doing well." As of the date of the hearing, she had a daily routine consisting of spending time with her niece and nephew—including getting them ready in the morning and babysitting. (Tr. 26.) She does not have problems taking care of her own personal needs and she performs household chores. (Tr. 27.) She can concentrate and keeps busy with crossword puzzles. She does not work on a computer. (Tr. 29.) She experiences incontinence and drools from the mouth due to her medications. (Tr. 28.) There are days that she does not leave her room. (Tr. 32.)

Plaintiff's mother, Darlene Stone, testified at the hearing to the following information. Before plaintiff's illness, she was the top sales person at her job. However, she couldn't perform "anything . . . like that now." (Tr. 36.) She has "a lot" of mood swings and is bothered by being in public around people. (Tr. 37.) In contradiction to plaintiff's assertions, she cannot "get along" with Ms. Stone's grandchildren and does not baby-sit the grandchildren. (Tr. 34.) Ms. Stone cannot leave plaintiff at home by herself for safety reasons; if left alone, plaintiff is "liable" to burn the kitchen down or walk out of a room and totally forget what she was doing. (Tr. 34-35.) Even with the medication, plaintiff "was very, very confused" more often than not, has trouble with simple things, and gets "totally frustrated." (Tr. 34-36.) She sleeps for about "an hour or so" within 30 minutes of taking her medication. (Tr. 37.) However, without the medication, she "wouldn't be able to function at all." (Tr. 35.) Ms. Stone must monitor

plaintiff's medication routine because, otherwise, plaintiff will stop taking her medication if she is feeling well. (Tr. 37.) Plaintiff wants people to think she does not have problems with concentration and, consequently, had been "planning" for the hearing. (Tr. 35-36.) She attends the YMCA not alone, but accompanied by Ms. Stone and her grandchildren. (Tr. 39.) In contradiction to plaintiff's assertions noted in Dr. Brockman's reports, Ms. Stone stated that plaintiff does not have friends except, maybe, one. (Tr. 39-40.)

Vocational Expert Dr. Jeffrey Magrowski testified at the hearing to the following. Plaintiff's previous jobs as an account executive and salesperson for car accessories and car spoilers are skilled positions. The physical demands of the positions are typically light, but could be medium if the worker needed to lift some boxes of accessories. Plaintiff's previous secretarial and sales positions are classified as sedentary, skilled work. Her work at a card factory was light and unskilled, but if she had to lift boxes of cards, it could be medium. (Tr. 41.) Her housekeeping work was medium and unskilled and her work as a waitress and server was light and semiskilled. (Tr. 41-42.)

Dr. Magrowski also testified that, hypothetically, an individual of the plaintiff's same age, educational level, and work experience— who has no exertional limitations, but is limited to performing simple tasks only, which require no more than occasional contact with the public and coworkers—could perform plaintiff's past assembly and housekeeping or cleaning-type work. The determination would likely remain the same if the hypothetical individual were subject to the same restrictions but, additionally, could not have contact with the public. (Tr. 42.) Further, an individual subject to the same limitations, but with the added requirement that any job must allow for occasional unscheduled disruption to both the workday and work week (secondary to potential periods of decompensation, inability to concentrate for appropriate periods of time during the workday) could not perform any of plaintiff's previous work. (Tr. 42-43.) Moreover, there are no other jobs in either the national or regional economy that an individual with all of those particular limitations could perform. (Tr. 43.)

Lastly, Dr. Magrowski testified that based on the limitations provided by Dr. Brockman and Grace Davenport, plaintiff would not be able to perform any of her past work or any other work that exists in the national economy. (Tr. 43.) The limitations considered included her doctor's opinion that plaintiff had poor or no ability to deal with work stress, functioning independently, and maintaining attention and concentration, and her ability to follow work rules was fair. (Tr. 44.)

### III.  DECISION OF THE ALJ

On July 22, 2009 the ALJ issued an unfavorable decision. (Tr. 8.) The ALJ followed the five-step sequential evaluation process for determining whether an individual is disabled and concluded that plaintiff has not been disabled, within the meaning of the Social Security Act, from April 7, 2007 through the date of the decision. (Tr. 11-13, 17.)

At Step One, the ALJ found that plaintiff had not engaged in substantial gainful activity since April 7, 2007, the alleged on-set date. At Step Two, the ALJ found that the plaintiff has a "severe" impairment: a Bipolar Disorder. (Tr. 13.)

At Step Three, however, the ALJ found that plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (Tr. 13.) The ALJ considered that regarding activities of daily living, she has mild restriction; in social functioning, she has moderate difficulties; and in concentration, persistence or pace, she has moderate difficulties. The ALJ concluded that because plaintiff's mental impairment does not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation—each of extended duration—the impairment does not qualify. (Tr. 14.)

Before moving to Step Four, the ALJ concluded that plaintiff has the residual functional capacity to perform a full range of work at all exertional levels, but with the following non-exertional limitations: simple tasks only which require no contact with the general public and no more than occasional contact with coworkers. (Tr. 14.) The ALJ relied on plaintiff's testimony that she baby-sits, tries to entertain

herself, and does not have medical problems that would prevent her from working. (Tr. 15.)

The ALJ also referred to selected testimony of Darla Stone, plaintiff's mother. Plaintiff was the top sales person at her job before the illness, but cannot work now. She has mood swings, is unstable when around people in public, and cannot be left home alone. Plaintiff sleeps after taking her medications, must be monitored to ensure that she is medication compliant, and is not able to function without medication. (Tr. 15.)

Additionally, the ALJ referenced plaintiff's medical history. Plaintiff had been admitted to Canyon Ridge Hospital and to Mid-Missouri Mental Health Center on several occasions (Tr. 15-16.) Also, plaintiff had been evaluated by Burrell Behavior Health and underwent a psychiatric review and mental residual functional capacity assessment completed by a state agency psychiatrist, Dr. Glenn Frisch. The ALJ relied on Dr. Frisch's conclusion that plaintiff could perform simple tasks with limited public contact. (Tr. 16.)

After considering the whole record, the ALJ found that plaintiff's impairment could reasonably be expected to cause some of the alleged symptoms. However, the ALJ concluded that plaintiff's statements concerning the intensity, persistence, and limiting effects of the symptoms are not credible and that the record failed to support allegations of a severe and debilitating impairment or combination of impairments. Lastly, the ALJ found that plaintiff's ailments appear troublesome, but do not impose limitations that preclude sustained employment. (Tr. 16.)

The ALJ based this decision, primarily, on a finding that the chief cause of the plaintiff's episodes of decompensation was medication noncompliance. Plaintiff's hospital records indicated that she had stopped taking her medications prior to each admission, which led to an exacerbation of her psychiatric symptoms. (Tr. 16.) The ALJ found that when plaintiff is medication-compliant, she has normal activities of daily living such as cooking, cleaning, exercising, socializing, and babysitting. (Tr. 16-17.)

The ALJ rejected Dr. Brockman's March 17, 2009 assessment that plaintiff's mental impairments left her with poor or no ability to function in a variety of daily activities and social situations. The ALJ reasoned that at that time of the assessment, plaintiff had been admitted to a psychiatric unit. The ALJ concluded that Dr. Brockman's report carried little weight because the cited limitations are ambiguous as to whether Dr. Brockman was assessing the plaintiff's mental state at the time of the report or if the specific restrictions were chronic. (Tr. 17.)

Lastly, the ALJ rejected a medical assessment completed on April 1, 2009 by Grace Davenport, plaintiff's clinical social worker. Ms. Davenport noted that plaintiff's mental impairments left her with poor or no abilities to function in a variety of daily activities and social situations and that plaintiff's mental impairments make it impossible for her to complete work-related activities. The ALJ reasoned that the record did not evince any treatment notes to support Ms. Davenport's assertions and, moreover, Ms. Davenport is not considered an acceptable medical source as specified in the Social Security Act. (Tr. 17.)

The ALJ concluded that plaintiff is capable of performing past relevant work as an assembler and housekeeper and, thus, is not disabled under the Act. (Tr. 17.)

### IV.  **GENERAL LEGAL PRINCIPLES**

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and is supported by substantial evidence in the record as a whole. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Id. In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. Id. As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary

outcome or because the court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A); Pate-Fires, 564 F.3d at 942. A five-step regulatory framework is used to determine whether an individual qualifies for disability. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Pate-Fires, 564 F.3d at 942.

Steps One through Three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her disability meets or equals a listed impairment. Pate-Fires, 564 F.3d at 942. If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five. Id. Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform past relevant work. Id. The claimant bears the burden of demonstrating she is no longer able to return to her past relevant work. Id. If the Commissioner determines the claimant cannot return to past relevant work, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work. Id.

In this case, the Commissioner determined that although plaintiff has a severe mental impairment, Bipolar Disorder, she retains the RFC to perform work limited to tasks which require no contact with the general public and no more than occasional contact with coworkers.

## V. DISCUSSION

Plaintiff argues that the AlJ erred in (1) failing to give the opinion of her treating physician, Dr. Brockman, controlling weight; (2) failing to re-contact Dr. Brockman for clarification of her medical report; (3) failing to properly consider additional opinion evidence; (4) determining her RFC; and (5) attributing her noncompliance with

prescribed medication solely to free will and not as a result of her mental illness.

## A.   Plaintiff's Non-Compliance

Plaintiff argues that the ALJ erred in concluding that the primary cause of her decompensation was voluntary noncompliance with the requirement that she take her medicine.

The ALJ may consider failure to continue treatment in determining whether a claimant may receive benefits. 20 C.F.R. § 404.1530, (individual who fails to follow prescribed treatment without a good reason will not be found disabled). Social Security Regulation 82-59 instructs that "a full evaluation must be made in each case to determine whether the individual's reason(s) for failure to follow prescribed treatment is justifiable." SSR 82-59, 1982 WL 31384, at *4.

The Eighth Circuit has recognized that psychological and emotional difficulties may deprive a claimant of the "rationality to decide whether to continue treatment or medication." Pate-Fires, 564 F.3d 935 at 945. Moreover, the Eighth Circuit has recognized that "a mentally ill person's noncompliance with psychiatric medications can be, and usually is, the result of [the] mental impairment [itself] and, therefore, neither willful nor without a justifiable excuse." Id. (alterations and citations omitted). Accordingly, the ALJ must determine whether a claimant's noncompliance is willful or a medically-determinable symptom of her Schizoaffective Disorder. Id. Failure to make this critical distinction, despite evidence in the record supporting involuntary non-compliance, requires remand. See also Sharp v. Bowen, 705 F. Supp 1111, 1124 (W.D. Penn. 1989) (To determine whether a claimant with a mental impairment reasonably refused treatment, the ALJ should consider whether the plaintiff "justifiably refused in light of his psychological, social or other individual circumstances" because "[a]n individual with a severe mental impairment quite likely lacks the capacity to be 'reasonable.'"). Moreover, in cases involving plaintiffs with mental impairments, "'justifiable cause' must be given a more lenient, subjective definition." Benedict v. Heckler, 593 F. Supp. 755, 761 (E.D.N.Y. 1984).

Here, the ALJ did not consider whether plaintiff's noncompliance with her prescription medication was attributable to her affective disorder. Rather, the ALJ appears clearly to have assumed that plaintiff's failure to follow her prescribed treatment was willful and, thus, unjustifiable. The ALJ observed that hospital admissions notes indicated that plaintiff "had stopped taking her medications leading to an exacerbation of her psychiatric symptoms." However, without further explanation, the ALJ concluded that "[t]he primary cause of the claimant's episodes of decompensation appears to be medication noncompliance." (Tr. 16.) The ALJ's apparent, although unstated, determination that plaintiff's noncompliance was voluntary on her part, without further investigation and fact-finding, is clearly speculative and not based on substantial evidence.

The ALJ's failure to obtain medical evidence regarding the effect of plaintiff's mental impairments on her ability to remain compliant with her medication requires remand. On remand, the ALJ shall obtain, and consider, evidence to determine the cause of plaintiff's noncompliance.

**B.   Residual Functional Capacity**

Plaintiff argues that the ALJ erred in determining her RFC. Specifically, plaintiff argues that the ALJ's decision is not supported by, and is contrary to, the medical evidence. In determining plaintiff's RFC, the ALJ reasoned that plaintiff's impairments were largely controlled with medication and, based on plaintiff's testimony, when plaintiff "is medication compliant, she has normal activities of daily living such as cooking, cleaning, exercising, socializing with her family and at times, even baby sitting for friends." (Tr. 16-17.) Additionally, on February 23, 2009, Dr. Brockman observed that plaintiff was "doing well." (Tr. 16.)

Evaluating mental impairments is frequently more complicated than evaluating physical impairments. Obermeier v. Astrue, Civil No. 07-3057, 2008 WL 4831712, at *3 (W.D. Ark. Nov. 3, 2008). In cases dealing with physical impairments, symptom-free periods offer strong evidence against a physical disability. Id. However, with mental impairments, symptom-free periods do not mean that a mental disorder has ceased. Id. Mental

illness can be extremely difficult to predict, and periods of remission are usually of an uncertain duration, marked with the ever-pending threat of relapse. Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir. 2001). See also Dreste v. Heckler, 741 F.2d 224, 226 n.2 (8th Cir. 1984) ("It is inherent in psychotic illnesses that periods of remission will occur. This does not, however, lead to the conclusion that the disability has ceased, particularly given . . . overwhelming evidence to the contrary . . . .").

Furthermore, the ALJ must determine the claimant's RFC using all of the relevant evidence. Fredrickson v. Barnhart, 359 F.3d 972, 976 (8th Cir. 2004). This determination will include the claimant's description of her own limitations. McGeorge v. Barnhart, 321 F.3d 766, 768 (8th Cir. 2003). However, "[i]n analyzing the evidence, it is necessary to draw meaningful inferences and allow reasonable conclusions about the individual's strengths and weaknesses." Reed v. Barnhart, 399 F.3d 917, 922 (8th Cir. 2005) (quoting SSR 85-16). Moreover, SSR 85-16 states that consideration should be given to: (1) the quality of the claimant's daily activities; (2) the claimant's ability to sustain activities, interests, and relate to others over a period of time; (3) the claimant's level of intellectual functioning; and (4) the claimant's ability to function in a work-like situation. SSR 85-16, 1985 WL 56855, at *2.

The ALJ relied on plaintiff's testimony that she engaged in activities such as cooking, cleaning, exercising, socializing, and babysitting. (Tr. 17.) However, activities such as cooking, cleaning, watching TV, socializing with friends, and shopping for groceries are minimal activities consistent with chronic mental disability. Hutsell, 259 F.3d at 709, 711-14. Moreover, the Eighth Circuit has "repeatedly observed that the ability to do activities such as light housework and visiting with friends provides little or no support for the finding that a claimant can perform full-time competitive work." Burress v. Apfel, 141 F.3d 875, 881 (8th Cir. 1998) (citations omitted); see also Banks v. Massanari, 258 F.3d 820, 832 (8th Cir. 2001).

Additionally, in cases regarding mental impairments, the ALJ "must take into account evidence indicating that the claimant's true functional ability may be substantially less than the claimant asserts or wishes."

Hutsell, 259 F.3d at 711 (citation omitted). In evaluating subjective complaints, the ALJ "must give full consideration to all of the evidence presented relating to subjective complaints, including . . . observations by third parties and treating and examining physicians . . . ." Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). Moreover, "[i]n selecting employees employers are concerned with substantial capacity, psychological stability, and steady attendance; they will not unduly risk increasing their health and liability insurance costs by hiring a person with serious physical or mental problems." Hutsell, 259 F.3d at 713 (citation omitted).

Here, the ALJ did not address evidence in the record that plaintiff's daily activities and abilities may be far fewer than she claims. Plaintiff's mother, Ms. Stone, testified that plaintiff wants people to think she does not have problems with concentration and that plaintiff had planned for the hearing. (Tr. 35-36.) In contradiction to plaintiff's testimony, Ms. Stone stated that plaintiff cannot get along with her grandchildren, does not baby-sit, and does not have friends except, maybe, one. (Tr. 34, 39-40.) Moreover, plaintiff attended the YMCA not alone, but accompanied by Ms. Stone and her grandchildren. (Tr. 39) Ms. Stone also testified that she cannot leave plaintiff home by herself because she might walk out of a room and totally forget what she was doing. (Tr. 35.) Additionally, even with the medication, plaintiff "was very, very confused" more often than not, has trouble with simple things, and is bothered by being in public around people. (Tr. 34-35, 37.)

Furthermore, the ALJ did not consider the opinion of Ms. Davenport, plaintiff's clinical social worker. In contradiction to plaintiff's statements relating to her daily activities, Ms. Davenport, noted that plaintiff's mental impairments left her with poor or no ability to function in a variety of daily activities and social situations and that her mental impairments make it impossible for her to complete work-related activities. (Tr. 17.)

The ALJ's failure to consider the record as a whole regarding plaintiff's symptom-free periods and her actual abilities requires

remand. On remand, the ALJ shall obtain and consider additional third-party testimony regarding plaintiff's daily activities.

**C.   Treating Physician's Medical Assessment**

Plaintiff argues that the ALJ erred in failing to re-contact her treating physician, Dr. Brockman, for clarification of her medical report. The ALJ concluded that Dr. Brockman's medical assessment on March 17, 2009 was "ambiguous in that it is unclear whether Dr. Brockman was assessing the claimant's current mental state [admittance to a psychiatric unit] or if these specific restrictions were chronic in nature." (Tr. 17.)

The ALJ should seek additional evidence or clarification from a claimant's medical source, if the report contains a conflict or ambiguity that must be resolved, or the report does not contain all the necessary information. 20 C.F.R. § 404.1512(e). "A social security hearing is a non-adversarial proceeding, and the ALJ has a duty to fully develop the record." Smith v. Barnhart, 435 F.3d 926, 930 (8th Cir. 2006). That duty includes a duty to contact a treating physician for clarification of an opinion, but "only if the available evidence does not provide an adequate basis for determining the merits of the disability claim." Sultan v. Barnhart, 368 F.3d 857, 863 (8th Cir. 2004). Stated differently, the ALJ's duty to contact a treating physician for clarification is triggered when a "crucial issue is undeveloped." Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005). See also 20 C.F.R. § 404.1512(e).

On remand, the ALJ shall re-contact Dr. Brockman and obtain additional evidence regarding whether plaintiff's episodes are chronic in nature. The ALJ shall then re-determine plaintiff's RFC in light of this evidence.

## VI.   CONCLUSION

For the reasons set forth above, the decision of the Commissioner of Social Security is reversed under Sentence Four of 42 U.S.C. § 405(g)

and remanded for reconsideration and further proceedings consistent with this opinion.  An appropriate Judgment Order is issued herewith.

                                               <u>/S/   David D. Noce</u>
                                          **UNITED STATES MAGISTRATE JUDGE**

Signed on August 22, 2011.